IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

JASON T. ACKNER, et al.           :
                                  :
                    Plaintiffs,   :
                                  :
v.                                :     CASE NO.: 9:16-cv-81648-KAM
                                  :
PNC BANK, National Association,   :
                                  :
                    Defendant.    :
                                  :

**DEFENDANT PNC BANK, NATIONAL ASSOCIATION'S NOTICE OF
SUBMISSION OF PRIVILEGED DOCUMENTS FOR *IN CAMERA* INSPECTION
PER COURT ORDER DATED APRIL 12, 2017 AND NOTICE OF SUPPLEMENTAL
AUTHORITY**

Defendant, PNC BANK, National Association ("PNC"), by and through its undersigned attorneys, hereby gives notice of its submission of privileged documents for *in camera* inspection pursuant to this Court's Order [DE 45] dated April 12, 2017. In this regard, on April 20, 2017, PNC delivered to the Court a privilege log and twenty (20) documents that it asserts are privileged and protected under applicable law (the "Sensitive Fraud P&Ps"). Pursuant to the Order dated April 12, 2017, PNC transmitted additional policies and procedures to Plaintiff's counsel on April 22, 2017. These policies and procedures contain certain information relating to PNC Bank's fraud detection methodology.[1]

The documents transmitted to Plaintiff's counsel on April 22 are different in nature and sensitivity than the Sensitive Fraud P&Ps submitted to the Court for *in camera* review on April 21, 2017. The Sensitive Fraud P&Ps contain highly sensitive fraud detection and mitigation

---

[1] PNC contends that the policies and procedures submitted for *in camera* review should be protected from production. However, in the event protection is not granted by this Court to all of the documents submitted, PNC would submit that an alternative procedure be implemented as proposed at the end of this submission.

procedures. They are part of PNC's defensive game plan against financial crime and a critical part of its information and financial account security program. They contain detailed instructions (complete with screenshots) on how to access and utilize PNC's anti-fraud systems and tools to detect and remediate customer account fraud – including account monitoring, suspension, reactivation, authorized transaction verification, account resetting and closing.

PNC maintains strict controls to prevent sharing of this information outside PNC's own security team, much less to outside entities. If compromised, these documents could be used against PNC, its customers and other entities within the financial system (which employ similar procedures) to engage in acts of technology facilitated fraud and other crimes. Such a risk of compromise is unacceptably high where the Sensitive Fraud P&Ps are not relevant to Plaintiffs' claims, which focus on the alleged unauthorized use of existing bank accounts by Mr. Ackner's father.

Precedent, public policy and sound information security practices militate against producing these documents to Plaintiffs' counsel, and ever more so to Plaintiffs and Mr. Ackner. There is currently nothing on record as to the information security standards and controls that Plaintiffs or Plaintiffs' counsel would employ to protect this extremely sensitive information. The existing Protective Order (DE # 50) ("the Protective Order") contains no information security standards or provisions that could ensure that these materials would be well protected if they must be produced outside of PNC, which is not a problem for the materials already produced to Plaintiffs but not for the Sensitive Fraud P&Ps. Under these circumstances, and even under the most scrupulous adherence to the Protective Order, this sensitive information could still be compromised by anyone from international hackers to non-malicious persons who would have access to the data in the course of this litigation.

In light of the exploding risks created by hacking, cybercrime and non-malicious cyber incidents, courts have repeatedly concluded that sensitive data about company information security policies and practices warrants heightened protection in the litigation process. *See, e.g., Oneamerica Fin. Partners, Inc. v. T-Systems N. Am., Inc.*, No. 1:015-cv-01534, 2016 WL 891349, at *2-4 (S.D. Ind. Mar. 9, 2016) (public disclosure of IT system information of questionable relevance to litigation would provide a blueprint for exploiting financial services company's defenses against hackers, fraudsters and other criminals); *Music Grp. Macao Comm. Offshore Ltd. v. Foote*, No. 14-CV-03078 JSC, 2015 WL 3993147, at *5-6 (N.D. Cal. June 30, 2015) (finding a "compelling" reason to seal exhibits detailing company's network infrastructure and security systems and security incident investigative procedures); *EON Corp IP Holdings LLC v. Cisco Sys. Inc.*, No. 12-CV-01011-JST, 2014 WL 1017514, at *2 (N.D. Cal. Mar. 11, 2014) (finding "compelling" reasons to seal documents that disclose "confidential technology, product configurations, security features, and network configurations"); *In re Google Inc. Gmail Litig.*, No. 13–MD– 02430–LHK, 2013 WL 5366963, at *3 (N.D. Cal. Sept. 25, 2013) (sealing information about users' interactions with the Gmail system based on Google's assertions that "hackers and spammers could use this information to circumvent Google's [anti-fraud and security procedures]" and based on the limited relevance of the information).

Nowhere are these concerns greater than in the banking industry, where the soundness of the global financial system and the protection of customer finances and confidential information rest on the security and fraud detection practices of financial institutions. The potential for compromise of PNC's fraud detection documents therefore should be viewed in the context of the cyber threat environment in which PNC operates. As the United States Department of the Treasury noted in late 2016:

3

> The size, reach, speed, and accessibility of the U.S. financial system make financial institutions attractive targets to traditional criminals, cybercriminals, terrorists and state actors. These actors target financial institutions' websites, systems, and employees to steal customer and commercial credentials and proprietary information; defraud financial institutions and their customers; or disrupt business functions.

U.S. Department of the Treasury, FINCEN, "Advisory to Financial Institutions on Cyber-Events and Cyber-Enabled Crime," FIN-2016-A005 (Oct. 25, 2016), available at https://www.fincen.gov/resources/advisories/fincen-advisory-fin-2016-a005.[2]

Financial institutions are accordingly subject to heightened regulation in terms of information security and fraud prevention. Each financial institution is required to tailor its information security and anti-fraud program to address the specific risks that it faces.[3] *See, e.g.*, FFIEC INFORMATION SECURITY BOOKLET (Sept. 2016), available at http://ithandbook.ffiec.gov/it-booklets/information-security.aspx (requiring financial institutions to maintain effective security programs, tailored to the complexity of their operations).

The SEC has acknowledged that disclosing security measures to any third party increases cybersecurity risks. In particular, the SEC stated, "We are mindful of potential concerns that detailed disclosures could compromise cybersecurity efforts – for example, by providing a 'roadmap' for those who seek to infiltrate a registrant's network security." Securities & Exchange Comm'n, Div. of Corp. Fin., "CF Disclosure Guidance" (2011), available at

---

[2] Technology facilitated financial crime continues to escalate at an alarming rate. The estimated cost of digital crime worldwide in 2016 exceeded $400 billion. *See* KPMG LLP, TAKING THE OFFENSIVE: WORKING TOGETHER TO DISRUPT DIGITAL CRIME 8 (2016), http://smartalwayswins.kpmg.be/assets/brochure/Chpt1-RethingTheDigitalSecurityThreat.pdf. The average cost of a data breach to a financial institution is more than $4 million. *See* PONEMON INSTITUTE, 2016 COST OF DATA BREACH STUDY: GLOBAL ANALYSIS 1 (2016), https://securityintelligence.com/cost-of-a-data-breach-2016/.

[3] Financial institutions are subject to numerous security regulations and requirements issued by dozens of regulatory bodies at both the federal and state level, including but not limited to: the Securities and Exchange Commission, the Federal Reserve System, the Federal Trade Commission, the Office of the Comptroller of the Currency, the Financial Industry Regulatory Authority, and the New York Department of Financial Services.

4

https://www.sec.gov/divisions/corpfin/guidance/cfguidance-topic2.htm. To mitigate the risk of such third-party data breaches, the Office of the Comptroller of the Currency requires national banks to ensure that the vendors and other third parties to whom banking information is sent have adequate security protections in place. *See, e.g.*, OCC, Bulletin 2013-29, "Risk Management Guidance" (Oct. 30, 2013). [4] As this agency cybersecurity guidance illustrates, the disclosure of PNC's fraud detection processes would provide cybercriminals and fraudsters with a roadmap to circumventing PNC's defenses.

Third party cyber risk is particularly acute where highly sensitive data is being produced to a law firm in discovery. The Federal Bureau of Investigation and security experts have viewed law firms as a weak link in cybersecurity for years – due to both the value of the client information they hold and at least a perceived lower level of data security than their clients. *See, e.g.*, Matthew Goldstein, "Law Firms Are Pressed on Security for Data," N.Y. TIMES, Mar. 26, 2014, available at https://dealbook.nytimes.com/2014/03/26/law-firms-scrutinized-as-hacking-increases/. Cyber criminals have been able to successfully penetrate the computer networks of even the largest law firms without detection for extended periods of time. *See United States v. Hong*, Crim. No. 16-CR-360 (S.D.N.Y.) (indictment of co-conspirators who hacked into AmLaw 100 firms and stole client financial data and intellectual property over an 18-month period).[5] The American Bar Association ("ABA") 2016 Legal Technology Survey revealed that 26% of

---

[4] In light of increasing concern over how third-party cybersecurity weaknesses could have a "systemic" impact on the financial system, federal banking regulators recently issued an Advanced Notice of Proposed Rulemaking on enhanced cybersecurity standards that would encompass "external dependency management" of "outside vendors, suppliers, customers, utilities, and other external organizations and service providers . . . ." *See* "Enhanced Cyber Risk Management Standards," 81 Fed. Reg. 74315 (proposed Oct. 26, 2016).

[5] *See also* Ed Breeson, "Anatomy of a Hack: How Cybercriminals Are Breaching BigLaw's Defenses," Law360 (Mar. 24, 2017), available at https://www.law360.com/articles/905062/how-cybercriminals-are-breaching-biglaw-s-defenses?hp_promo_indepth=1.

5

respondents from law firms with 10-49 attorneys or over 500 attorneys admitted experiencing some type of breach in 2016. This troubling trend has led clients to increasingly insist that lawyers improve their cybersecurity standards. *See, e.g.*, Association of Corporate Counsel, "Model Information Protection & Security Controls for Outside Counsel Possessing Company Confidential Information" (Mar. 2017), available at http://www.acc.com/advocacy/upload/Model-Information-Protection-and-Security-Controls-for-Outside-Counsel-Jan2017.pdf?_ga=1.240610051.148475112.1492817530.

Requiring PNC to produce the Sensitive Fraud P&Ps to Plaintiffs under the current Protective Order would not meet the minimum standards to which PNC is subject and that it requires of its business partners for sensitive, confidential PNC information. Before PNC allows any third party to possess its confidential information, a thorough and rigorous assessment against a set of information security and privacy controls must be conducted to ensure adequate protection. As part of PNC's information security practices, vendors are required to complete a detailed questionnaire detailing precisely the safeguards they have in place. Once a vendor is compliant, vendors much agree to a minimum set of contractual controls, including but not limited to the right to audit the supplier and reviews of security testing and external audits. None of these safeguards are in place here.

### Possible Alternative Procedure

Although PNC believes that the Sensitive Fraud P&Ps should not be disclosed at all, a possible alternative procedure would be to permit Plaintiffs' counsel to review the documents in Defendant's counsel's offices. If Plaintiffs' counsel believes that certain documents are relevant *and must be possessed by Plaintiffs during this litigation*, they could petition the Court to order disclosure with appropriate safeguards in place. Such a procedure would mitigate the immediate

threat posed by transferring PNC's Sensitive Fraud P&Ps, which PNC maintains are not relevant to this case.

This procedure also would be consistent with the practices of other courts. *See, e.g., United States v. Pani*, No. 08-CR-40034 (D. Mass. Mar. 1, 2010) (D.I. 72) (allowing defense counsel and Defendant to inspect sensitive discovery materials only at "the FBI's Boston Office"); *United States v. Williams*, No. 1:06CR0313-3 (N.D. Ga. Dec. 15, 2006) (D.I. 79) (ordering that defense counsel and computer forensic experts could examine 4 computers seized from defendants and containing Coca Cola's proprietary data only at FBI office).[6]

        Respectfully Submitted,

        BUCHANAN INGERSOLL & ROONEY, PC
        100 S. E. Second Street
        Miami Tower, Suite 3500
        Miami, Florida  33131
        Telephone: 305-347-4087
        Facsimile:  305-347-4089

By:   */s/ Mark S. Auerbacher*
      Mark S. Auerbacher
      Florida Bar No. 978220
      mark.auerbacher@bipc.com
      Jennifer Olmedo-Rodriguez, Esq.
      Florida Bar No. 605158
      Jennifer.olmedo-rodriguez@bipc.com

-and-

BUCHANAN INGERSOLL & ROONEY PC
401 East Jackson Street, Suite 2400
Tampa, Florida 33602-5236

---

[6] This approach to protecting a litigant's confidential and proprietary information is similar to that now codified in the Defend Trade Secrets Act of 2016. This new law empowers a Court to take custody of and "secure [intellectual property] from physical and electronic access . . . ." 18 U.S.C. § 1836(b)(2)(D)(i). The court "shall prohibit [any storage medium containing the seized material] from being connected to a network or the Internet without the consent of both parties . . . ." Id. § 1836(b)(2)(D)(ii). Such storage medium should be encrypted while it is in the court's custody. Id. § 1832(b)(2)(H).

7

BUCHANAN INGERSOLL & ROONEY PC :: Miami Tower :: 100 S.E. Second Street, Suite 3500 :: Miami, FL  33131-2148 :: T  305 347 4080 :: F  305 347 4089

Tel: 813-222-8180
Fax: 813-222-8189

Victoria Oguntoye
Florida Bar No.: 114114
victoria.oguntoye@bipc.com

*Counsel for Defendant, PNC Bank, National Association*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 24, 2017, I served the foregoing document and attachment via electronic mail upon Jeremy J. Hart, Esq. and Brett M. Amron, Esq.; Bast Amron LLP, Counsel for Plaintiffs, One Southeast Third Avenue, Suite 1400, Miami, Florida 33131.

/s/ *Mark S. Auerbacher*
BUCHANAN INGERSOLL & ROONEY, PC

4821-9011-9495, v. 8~~4821-9011-9495, v. 7~~

8

BUCHANAN INGERSOLL & ROONEY PC :: Miami Tower :: 100 S.E. Second Street, Suite 3500 :: Miami, FL  33131-2148 :: T  305 347 4080 :: F  305 347 4089